Four cases that have been consolidated for purposes of oral argument. And the first of the numbers of these cases is number 13-1277, OPTIMUM POWER SOLUTIONS v. HULETT PACKARD. Mr. Harrison. Yes, Your Honor. You can proceed. Thank you. May it please the Court. My name is Brian Harrison, and I'm here on behalf of OPTIMUM POWER SOLUTIONS LLC. There are four relatively straightforward issues before the Court this morning. One of those is procedural, and then there are three substantive claim construction issues. Could you help me understand? We asked you to be prepared to address Jane. And what does the stipulation mean here? Because with respect to the logic control means, there seem to be three separate sub-issues. Does the stipulation mean that if you lose on any one of the sub-issues that we should affirm the judgment of non-infringement? Yes, Your Honor. We have to have a home run here. A home run, which means winning all three of the sub-issues under the logic control means. Yes, Your Honor. Okay. And the problem is we don't have any idea from this record what the accused devices are like as to why there's non-infringement. But at least I understand what's going on. I understand, Your Honor. Okay. Why don't you go ahead and proceed. Certainly the first issue is a procedural issue, and it is relatively straightforward. The appellees contend that this appeal is barred by collateral estoppel because of a settlement agreement entered into between Optimum Power and Apple. Do we have that anywhere in the record? It is not in the record. The settlement agreement? Yes, Your Honor.  If you'll give me just a moment. It is in the record at A354, and the operative paragraph that I would want to bring to the Court's attention is at page A356, and that's paragraph 7. But the ultimate settlement agreement which was reached with Apple while the case was on appeal to us, we don't have, correct? Correct. The actual settlement agreement itself we do not have. The stipulation is what they base their collateral estoppel argument upon. And was it so that the case was on appeal when it was settled? Is that right? Correct. That is correct. And was the settlement simply to dismiss the appeal, or was the underlying district court judgment in any way touched? The underlying district court judgment was not in any way touched. So why is this a matter that's within the so-called consent judgment approach of Arizona? It is not. This is not within the Arizona. Because in Arizona versus California, the Supreme Court instructed that it must be clear that the parties intended the effect of collateral estoppel to apply. To a consent judgment. Yes. But it seems to me don't we have here a situation where there is a – putting aside the settlement that occurred on appeal, there's the judgment that you just – the stipulated judgment. Correct. And does that resolve the claim construction issue? No. It does not. And the reason it does not is the stipulated judgment states – and it is at page A359 of the record – that this final judgment of non-infringement is in accordance with the party's stipulation for entry of final judgment as to non-infringement of U.S. patent number 5781-784. That ties back then to the stipulation to which I was referring earlier on page A356, paragraph 7, in which it said, notwithstanding anything in the foregoing part of the agreement, optimum power specifically objects to the court's construction of a logic control means limitation and power supply limitation as well as other construction set forth in this court's order. The parties reserve their rights to challenge these or any other constructions of the disputed claim phrases of the 784 patent on appeal. Which is what happened. You did take an appeal in order to challenge the constructions, but then you gave up the appeal. If we had a situation, let's hypothetically say, in which there had been a claim construction and instead of a stipulation of non-infringement, the district court had considered the accused of ISIS and determined that under the claim construction there was no infringement. There was an appeal. While the case was on appeal, it was settled and the appeal was dismissed. Would that have resulted in collateral estoppel? Not with this language. No, no. I'm assuming that there's no stipulation. Forget about the stipulation. Okay, forget about the stipulation. But there was no stipulation. We simply had a claim construction. We had a district court, let's say, summary judgment decision, which says there's no infringement. An appeal is taken. While the case is on appeal, it's dismissed as a result of a settlement. Would that result in collateral estoppel? It would depend upon whether the parties intended that dismissal to have that effect under Arizona versus California. Well, how are we supposed to determine the intent if we don't know what the settlement agreement says and all you have is a dismissal? That would be a difficult situation to be in as a party trying to pursue the appeal. Within the hypothetical? Yes. In the hypothetical you've given me, that would be a difficult position. And, in fact, in that position, I think it would be more prudent to vacate that judgment. Yeah, and that's what people do. Exactly, in that situation. Here we have a very different situation where we've stipulated, and it's clear from the stipulation, that collateral estoppel is not intended to apply. Well, I don't see that. It doesn't say anything about collateral estoppel in other cases. It says you reserve the right to appeal, which you did. Well, this stipulation was entered into after the appeal had already been filed. So? So in order for that paragraph 7, then, to make any sense, paragraph 7 must be referring to the other co-pending appeals. Otherwise, why would we reserve our rights to challenge these or any other constructions of the disputed claim phrases of the 784 patent on appeal when we had just dismissed that appeal? Now, wait a moment. It can't be that the Apple stipulation was entered after the Apple appeal. This stipulation in the Apple case must have been entered before you took an appeal in the Apple case, right? You're right. I'm sorry, you're correct. That is correct. So why isn't this best read as saying, okay, here's a stipulation to resolve the Apple case, but we have the right to appeal the claim construction with which we disagree? That's certainly one way to read it. I would suggest that that's just one way to read it. And your argument is that since it's not clear, Arizona meets California? Applies. Exactly. But if you'd entered into this stipulation, you prosecuted the Apple appeal, and the Apple appeal had resulted in an affirmance, you'd have collateral estoppel, no? I'm sorry, I don't understand. If the Apple appeal is prosecuted? Prosecuted and is decided by this court and we affirm. Yes. Right? That would result in collateral estoppel. It could. It would, right? Well, I'm curious as to whether the Applees would agree that they would be collateral estopped from challenging it. I certainly would be taking the position that if we got an affirmance that that affirmance applied across all of the cases, that would be certain. They would certainly at least want to make, I'm certain, their arguments and argue that they weren't entitled to their fair and full opportunity to litigate those arguments and that they would want to make their presentation to this court. And I think more likely than not, this court would say, no, we've heard it. We've ruled claim construction is a matter of law. No, but we're not talking about people who aren't parties to the appeal here. We're saying you would be bound. If we were to affirm, if we had heard the Apple appeal, your appeal in the Apple case, and we had affirmed, you'd be bound by collateral estoppel. Yes. Right? Yes. So why should it make any difference that the appeal was disposed of by a dismissal of the appeal rather than actual affirmance? Because it is unclear from the dismissal whether the parties intended for collateral estoppel to apply. The Supreme Court said it only may apply. Other equitable factors may balance out. The Supreme Court in Arizona wasn't talking about a stipulation which enabled an appeal. They were talking about a settlement of the entire case. That is correct. I would argue that the two are clearly analogous. Okay, well, I don't want to consume too much of your time on this point unless my colleagues have other questions on the collateral estoppel. Shifting to at least one of the merits points, the power supply limitation issue, if we agree with the district court on that, that resolves the case, right? I think that's an implication of what you said in answer to an earlier question about your having to, I forget what the language was, but basically win on everything. Correct. And so how could the district court be wrong about the claim construction there based on the, essentially, the adoption of language that is virtually verbatim from the prosecution history? Well, it's not virtually verbatim because they left out an important phrase, and that is the phrase that we asked the court in their reconsideration to add, and that was, without necessarily varying the power to the rest of the system. So why when specifically asked by the district court, I think in the colloquy on claim construction, did you say that's fine with us? Because it was unclear from what the district court was asking to what we were agreeing. My understanding is that there was a specific reference by the district court to slide 45, which had the language. The district court read you the changed language. What was unclear about it? We had gone back and forth, as the court can see from the record, in terms of whether without necessarily was required. What I understood the district court to be doing was changing the construction so that it read can and then without necessarily. That was what I understood she meant by with the et cetera that she was referring to. So with that understanding, we agreed to it, and we agreed to that construction here today. And in fact, my understanding is the appellee's position is that change to the construction is immaterial. And therefore, if it's immaterial and we think it is material, we think it's appropriate then to go ahead and get it to us. We believe it is. What is the difference between adding the word necessarily and not adding the word necessarily? Because when viewed in light of the entirety of the discussion, and again, we're dealing with the discussion of a prior reference called Fung. And the applicant said that Fung teaches a power conservation system as part of a complete computer system. Fung does not teach a memory-specific power management scheme. Fung only teaches decreasing the frequency of refresh times of a DRAM, not varying the power level or the voltage supplied to a memory. Also, Fung does not teach multiple voltage settings supplied specifically to a memory or to any other element of the disclosed computer system. Claims 1 and 23, on the other hand, disclose varying the power level supplied to a memory without necessarily varying the power level supplied to the rest of the system components. That's the construction that we're asking for. I don't think you've explained to me what the difference is between adding or not adding the word necessarily. Because Fung was a system-wide implementation of power management. It applied no matter what level was being supplied to the memory, that same level was supplied to the rest of the computer system. Our position is that the without the necessarily means that it can supply to the memory integrated circuit, but doesn't have to supply a voltage at that level just to the memory integrated circuit. It can supply it to any subset of components less than the entire system without running afoul of Fung. My problem is if you enter into a stipulation and say that you're happy with it, which is what the quote was, if you really don't understand what it means, you ought to clarify it on the spot. In looking back, I couldn't agree more. Can I ask, if we were to disagree with you on that point, is there any continuing significance to any of the other claim constructions that are at issue? Obviously not in this case, but in other cases on these patterns? No. If you agree that the power control or power supply limitation is as the district court construed it, that is going to end our ability. Just to be clear, I did have some difficulties with some of the district court's other claim constructions, particularly the logic control means, but you're saying that that's not of significance? No. If we lose power supply, we lose. Do you have anything further you want to reserve the rest of your time for? I have about three more minutes, if I may just briefly touch upon the remaining two issues, and those are the power control means. Plain and simple, the parties stipulated to a function of the power control means as supplying a variable voltage to the memory integrated circuit. The key aspect is taking a constant power supply and creating from that and supplying to the memory integrated circuit a variable voltage. And that is clear from the party's stipulation as to – or the party's positions as to structure. If the function was really supplying power and then varying it, the corresponding power supplies would have had to have been part of the structure. Neither party suggested that one, which would be the minimum power supply required for the structure. Given that, it can't clearly be the case that supplying this constant power supply is part of the supplying a variable voltage function. Instead, it is simply taking the constant power supply and creating from that and supplying to the memory integrated circuit varying voltage levels. Suppose that I had doubts of the sort that you, I think, just rested on about why in the world are BAT1 and BAT2 not part of the structure? But why wouldn't I draw the lesson from that they should have been and you therefore a force you or I lose as opposed to drawing the lesson that you are drawing, which is since they should have been part of it and aren't, then other things must also be excluded from the corresponding structure. Well, if this court redefines the function, then I would agree with you. But the function is stipulated to the parties and agreed to as part of the district court's order was supplying a variable voltage to the memory integrated circuit. But that suggests to me actually getting the varying voltage to the thing. Exactly. It is getting the varying voltage to the thing is defined by the structure that we have included. Power Director 29 does not have anything to do with getting the variable voltage to the thing. Power Director 29 is simply a switch for selecting between different power sources. And the low pass filter? The low pass filter is part of the… So it's just the Power Director? Power Director 29 is the issue. And can 27 on its own supply a variable voltage? 27 on its own does not supply a variable voltage. Supplied by one of the batteries? No. The batteries supply a constant voltage. The batteries supply a constant voltage. I see that my time for going over this is up. The remainder of my time for any rebuttal. Okay. Thank you. Mr. Alexander? Thank you, Your Honors, and may it please the Court. I'm Paul Alexander. I'm here on behalf of HP. This morning, as the Court has noticed, there are four appeals. Counsel for Dell, Lenovo, and Sony are all present and would respond or will respond if the Court has a question specifically. How could we have any questions since we have no idea what the differences are, if any, among the accused devices? Right. The issues are common, which is why, to be efficient, I'm going to present the arguments for the parties, for all the parties. And the issues are claim construction. I will turn to the collateral estoppel issue quickly first since the Court raised it first because I think that that is an issue. There are two issues that—three issues, actually, that dispose of the entire case. So I'll just briefly address that since the Court had questions right off the bat. Optimum power—what we have here is a final judgment. It is, for all purposes, a final judgment. Collateral estoppel should apply because, under the Ninth Circuit law that applies, we have a final judgment. It is based upon an actually adjudicated claim construction order. And the issues that are now before this Court are the exact identical issues, the same claim construction order, and the parties are the same. And you've left out critical requirement. How do we know that the specific claim construction rulings were necessary to that judgment? That's one of the elements of collateral estoppel. Because in the stipulation for final—for entry of the final judgment, it recites those very claim constructions and states that in light of those claim constructions, there is no infringement. And therefore, parties are stipulating to judgment. That is what led to it. But that suggests that the claim constructions were sufficient for non-infringement. It doesn't tell us that those claim constructions were necessary for non-infringement. And I take it that the underlying rationale of the Supreme Court's standard in Arizona for consent judgments is that when you get to the final judgment by virtue of consent, you may not actually be able to tell whether some underlying ruling was necessary to the underlying judgment. Rather, there may have been consent about getting to the final judgment because there are various alternative ways that could have gotten there. And therefore, in the absence of—and therefore, you have to look at the consent. So why are the claim constructions here necessary to the bottom line in non-infringement judgment? Well, because as reflected in the stipulation for entry of judgment, they are exactly what led to it. The parties agreed that given these claim constructions, there was no infringement. Now, I can explain the reasons for that, but that was the judgment—that was the reason for entry of the judgment. Let me just see if I can say this a different way. How do we know that the same non-infringement judgment, had there been further litigation and maybe reversal of claim construction, might not have been arrived at on the basis of alternative claim constructions? In this case— In which case these would not have been necessary. Because the parties stipulated that these claim constructions applied to all the cases. These are the claim constructions in all of the cases. Where did the parties make it clear that they intended the agreement to have preclusive effect? That's an excellent question. Let me answer that directly. What the parties intended was a final judgment. Your Honor, it was not a consent decree. If it had been a consent decree, there could be no appeal. You don't—when you reach a consent decree, usually with the government, it is to resolve issues, usually without litigation. And you don't appeal from a consent decree. What they wanted, Your Honor, was a final judgment. So every final judgment moves out the discussion in Arizona v. California? In the sense that—well, in Arizona v. California, the actually litigated portion of the judgment that was at issue in that case, the court said would have been subject to collateral estoppel, except that the government had waited 10 years to raise it and then waived it. So yes, if a judgment is based upon an actually litigated order, yes, that judgment yields collateral estoppel. And that's what they wanted. They wanted a final judgment because they wanted to go on appeal. And so what you're looking— What you're saying is the collateral estoppel effect should vary depending on whether the final judgment was a stipulated final judgment or one that was the result of the district court not only addressing the claim construction but also the non-infringement. But let me ask you yet another question about this. Let's assume there had been no stipulation here. The district court had said there's non-infringement because of A, and alternatively, there's non-infringement because of B, which is essentially what the stipulation arrived at here. And there was an affirmance by our court, just in Rule 36 Affirmance. My recollection of the restatement of judgments is that where you have alternative grounds for a decision and an affirmance by the court— and I'm assuming no stipulation or anything like that— that it's not collateral estoppel because you can't figure out which of the two grounds the affirmance rested on. Am I correct about that? If it were a consent decree— No, no, forget consent decree. I'm assuming hypothetically no consent decree. There's just a decision by the district court to say there's non-infringement because of A or B. Right. And there's a simple affirmance, Rule 36 Affirmance. Is that judgment collateral estoppel as to either one of those? My recollection, and I haven't gone back to look at it, is that under the restatement, if you have alternative grounds and an affirmance and you can't tell which ground was adopted by the appellate court, that there is no collateral estoppel. Am I wrong about that? Well, I'm not going to say that the court is wrong, but what I'm going to say is that here in this case— No, no, forget this case. Deal with my hypothetical. Right. In a case where the issues have been actually adjudicated, in this case the claim construction order, then collateral estoppel would arise as to those issues that were actually adjudicated. Both of them, even though— Both of them, because they were both actually adjudicated. Right. My recollection is very much what Judge Dykes is, that in fact, if there are alternative rulings in general, neither one of them gets collateral estoppel effect for the simple reason that neither one of them can be said to be necessary. Although in this case, both exist and both were necessary and both are proven here. No, they're not both necessary because you don't want to say that. You really don't want to say that. Your theory is you win on either one, you win. Right. What I would say on this, Your Honor, is that the judgment below was intended to be a final judgment. There is a clear way, if you want that judgment not to have collateral estoppel effect, to make sure that it does not, and that is to vacate that judgment. When you just let the judgment stay final because what you intended was a final judgment and don't vacate it, then collateral estoppel should apply. That's our position on that, and I think that's what the cases basically say. And you can try to, and I think collateral estoppel should apply here because what we have here is a very sophisticated litigant. They know the rules. If anyone should follow the rules, it is they. They come to this court often, and in the case of collateral estoppel, you have an important federal policy. You have a policy that should be applied evenly. And so if it is applied evenly, then you can't simply avoid it by saying, well, that wasn't my intent at the time. Maybe I dismissed my appeal, which is what I heard Mr. Harrison say, or at some other time. Their intent was to have a final judgment, and that final judgment should have collateral estoppel. This reminds me a bit too much of the code plating that preceded the federal rules of civil procedure. Snares for the- Well, perhaps, perhaps, Your Honor, except I will say that in reading this and preparing for the argument, I did note the Supreme Court's opinion in Federated Department Stories v. Moy, which is, I'll give you the cite in just a second, but the Supreme Court said there that these principles of race, judicata, and collateral estoppel are very important. This is 452 U.S. at 394. And in pointing to those principles, the court said at 401 and 402, the predicament in which respondent finds himself is of his own making, not getting the judgment vacated. We cannot be expected for his relief to upset the general rule of collateral estoppel, in this case race judicata. The court went on to say the mischief that would follow from establishing a precedent for disregarding the principles against belonging and strife would be greater than the benefit which would result from relieving some case of individual hardship. So what the court is saying is that these are important federal principles. These are the rules. If you have a judgment, a final judgment that has collateral estoppel effect, you should vacate that judgment. Those rules should be followed. They should particularly be followed by a sophisticated litigant, and that's why collateral estoppel should apply. And just so I'm clear about the timing, all of these judgments at the district court level were entered at the same time? Apple was entered first. Roughly. I mean, would you give me some dates or something? Roughly. Apple's judgment was entered... Is that March 19th? Yes. March 18th, 2013 at 3.52? Is that what I'm looking at? Right. Oh, that's HP. March 19th, 2013, and the judgment in our case, the HP case, was entered in... This is... March 18th, the day before. Well, mine's...the one that's in my record is signed but not dated. But it would not have been entered the day before. It would have followed the Apple judgment. The Apple judgment and the Apple case came first. Apple...that case was appealed. Our case is followed. No, the orders are actually...the stipulated orders are...the stipulations are a day apart in the other direction. They're close together then. And then these appeals, that is the appeal in the HP and whatever else we have here, cases, were pending all at the same time. That's correct. The Apple one and then the Apple case was...the appeal was dismissed. Dismissed. That's right. So I'll move on, if I may, Your Honor, to the next issue which the court has observed will resolve the entire case, and that is the issue of the power supply limitation. Now, I must say the record is very clear on what took place in open court. And this starts at...the HP appendix site is A00323. The court had listened very carefully to the parties' constructions. The parties had their respective constructions before the court in a slide called slide 45. I actually have a copy of that if it would be helpful to the court. It's at page 24 of our brief, and I have a copy if the court would like to have an additional copy to refer to. I think we can look at it in the brief. In the brief. What happened at that hearing was that the court added one word to the construction that Apple had proposed. Beginning in the...referring to the slide 45, which was Apple's proposed construction, she said, but leaving that aside, a grammatical issue that she had talked about, so on slide 45, would you be happy with your proposed construction wherein the power control means can supply power specifically to the memory? And the can is the word that she added. And then she said, et cetera, which from the record clearly refers to slide 45, which is what she was referring to, and slide 45 goes on with the rest of the language without varying the power level or voltage supplied to the rest of the electronic system in which the device and memory integrated circuit is embedded. At least part of their argument, though, is that they understood based upon the earlier colloquy at 286 and 287 that the word necessarily has been added to the language in the slide, and that as a result of that, the word necessarily was part of what they agreed to, and it didn't end up in the final claim construction. I have two responses to that, Your Honor. First, if one turns to the record at A00288, starting about line 22, it was Optimum Powers Counsel himself who made the argument about this can language, not the necessary language. He talked about that, too, but he said, now, this is at page 288 of the record. He said to the district court, now, similarly in the defendant's responsive claim construction brief, they cited an office action that was a response dated January 4, 1995, that completely supports exactly the position in which the prosecution attorney said, Figure 1 clearly shows that VCC input at DRAM 13 is coupled to the power director 29 through low pass filter 31. Consequently, power director 29 can vary the voltage supplied to DRAM 13 without varying the voltage supplied to the rest of the electronic system in which the power management device is embedded, and then counsel emphasized that passage. Now, they neglected to highlight the words can vary the voltage, so it was Optimum Counsel itself who presented this passage to the court, which, of course, is consistent with her construction. Does the word necessarily make any difference in the claim construction? The discussion in the record about the word necessarily was that it was confusing, that it wasn't necessary. No, but what's the answer to my question? Does it matter? Yeah. I think what the court concluded was that- No, I don't care what the court concluded. I want to know what you think. Does it matter? I think not having the word necessarily is significant because of the fact that it adds confusion. That's what I think. I think it just adds confusion. I think the court's construction- But does it make a substantive difference? Probably not because it can supply the value. I don't understand the argument that Mr. Harrison makes, but it may well make a substantive difference if what they're saying is that this creates a different way that you can supply power to one thing or another thing or four things, and if you do that to any of them, then you can supply, then you beat this claim limitation. What the claim limitation was all about was supplying power specifically to the memory-integrated circuit. That's what exists throughout the claim construction, the prosecution history, the ability to provide power specifically to the memory-integrated circuit. And if what he's trying to do with this necessarily word is to vary that, change that representation to the patent office, then it does matter. I would have thought your answer to my question was necessarily that it's just the same thing. It doesn't make any difference. Well, I think that is what the district court thought. It's not what you think? What I think is is that it adds confusion, and there's no point in adding confusion. It shouldn't add anything at all. It should not change. The argument before the court was not that that would change the language. It would be confusing to the jury, and the claim construction should be concise. Bound by the inherent conservatism of lawyers. Well, perhaps. Perhaps. Because when I hear an argument, as I just did, that this somehow changes the language, if that's true, if somehow this changes the intent that was stated throughout the prosecution, then right. But I think it's a make-weight argument, quite frankly. Because, and here's my second answer to your question, Your Honor, the court in her decision clearly said the parties have agreed to this construction. Couldn't have been clearer. The parties have agreed. And there was no motion for reconsideration. There was no motion for reconsideration. That was where it sat, and it stayed just like that, and it remains just like that. So I would say that by agreeing to the court's construction, and then once you've agreed to the court's construction in open court, and I can go back to all the language she gave. She asked twice about that. Are you happy with it? Are you happy with it? Yes, Your Honor. And then when she says in her decision, the parties agreed to this order, and then you do nothing. You have waived the right to come now and say what I agreed to in open court, what I understood the court to say clearly in her opinion, you've waived the right to challenge that construction. And to say that I wasn't clear doesn't change that. If Mr. Harrison wasn't clear, frankly, that is his problem. The court was very clear, and the parties were clear. So that should end the case, quite frankly, because if that construction is affirmed, then the case is at an end as Mr. Harrison pointed out. Now I would say to the court further that even if you didn't look at that agreement, and I think you should. I think that's what determines. I think that's a waiver. But the prosecution history clearly supports exactly the construction that the court arrived at. So even if you were to look at it to no avail, including the passage that I just read, which Mr. Harrison himself advocated to the court as something she should look at, when you look at the prosecution history, this construction is well supported and should be affirmed. So if the court has questions on that, I'd be happy to address them. Otherwise, I'll turn to the logic control means, which I understand there may be some questions about. Right. So that one says it's about something creating, not about something providing. Create something that is provided. That doesn't mean the thing that's creating has to do with providing. Why isn't the district court's construction, which in this case is the identification of the corresponding structure, simply confuse those two things? Well, my response to that is in addressing this. This is essentially the mirror image of the power control thing, where the judge was very specific about saying, no, it actually has to supply. So we look at all the things that are doing the supplying and everything in the chain that does the supplying. I thought kind of conspicuously there is not a comparable word in the logic control means. I think there is. It is much easier to address this if the court has in front of it figure one, which I have a copy of and which I think is at page four of our briefing, and also in the patent at A0020, I believe. So the court is correct. The parties agreed to a function, which was to generate the power and control signals provided to the memory integrated circuit. So the word provided is there. It's not the only word. I agree. But it is part of that function. Right. I mean, I think you probably understand this, but obviously provided is not providing. What this thing has to do is to create something that has certain characteristics, and the characteristics include that it eventually be provided. That doesn't mean that the thing that's doing the creating has to do the providing. But it has to be the signal that is created and provided to the integrated circuit, would you argue? Yeah. Right. So if we go to figure one and we just look, for example, I think this is an excellent example of this, the same argument applies throughout. If we look at the DRAM-13 and the ADDR line, which would be the address signals. So if you look at where those address signals come from, they come from the slew rate controller. The slew rate controller actually creates the signal that goes to the memory integrated circuit, the DRAM. It specifically says that in the specification. It shows it in the diagram. Those signals are created at the slew rate controller such that their rise and fall times are slowed. And that, of course, serves the overall purpose. So your argument is that creating the signal and generating the signal are the same thing? Creating a signal and generating the signal can be the same thing. I don't fasten a huge amount of – I mean, I think generating and creating are essentially the same thing. I don't think generating is different from creating. The signal, the signal, if you go next to the encoder, if you go next to the encoder, this is the gray code encoder. So if you want to know the actual ones and zeros that are sent that constitute the address, those are not the signals that are generated by the binary address generator. This you can see at the chart at page 30 of the appellant's brief, which is also in the record in a couple of places. In that chart, which I also have a copy of, in that chart you will see that the actual signals, the ones and zeros that are created and then that are sent to the memory integrated circuit are not the signals that the binary address generator generates. At every point after stop two, for example, the binary generator generates 0010 in this example. The gray code signal is not that. It is 0011. That is a different signal. That is a function called out for by the inventor. Of course it serves the overall purpose of the patent, but this is a means plus function patent with a single embodiment, and the inventor said this is what creates the ones and zeros that go into the signal, which is then varied by the slew rate controller and created to rise and fall, and that is what goes to the memory integrated circuit. The binary generator generates a binary address. That is one part of what must be done, and no one claims that that is not significant or essential. Everyone agrees that that is part of the structure, but it does not generate the signal that goes to the memory integrated circuit. The ones and zeros are created in the gray code encoder, and then the actual signal itself is created in the slew rate controller, and the specification calls all of those structures out, and it says they all exist. It does not say that they are optional or preferred or anything like that. So this is what you have. You have an inventor who set forth in a single embodiment in this means plus function claim and then described it, this embodiment, and in order to do what Mr. Harrison wants to do, to take out, in the other case, the power director, but in this case the slew rate controller, and to take out the gray code encoder, that is what rewrites the invention. That would change the invention. That would be different from what the inventor actually wrote and put in this invention and disclosed to the public. So that is what I think would be inappropriate, and the same applies with the slew rate controller on providing the control means to the RAS-CAS line. The slew rate controller is what creates those signals. The inventor said all inputs are put into the slew rate controller so that it can do this function, and that function, when you stand back, is essential to the function of the patent. So all of those are required. Why do we know that? Because that's what the inventor told us. That's what his specification says. That's what figure one says. So I'll last go to the—well, let me talk quickly about the power director. We talked about that. The power director that Mr. Harris talked about at the end is also set forth in figure one, and if you look at the boxes there, the only dispute, of course, is power director. This is the power control means. He agrees that the AD converter, the timing sequencer, and the arbiter, and the power feedback are all necessary. The power director, according to what the inventor and the prosecuting attorney told the patent office, is—and we've actually said this a couple of times—power director 29 can vary the voltage supplied to DRAM 13. In his argument a moment ago, it was supplying variable voltage that he said was the function. In arguing to the patent office, the patent—the prosecuting attorney specifically said power director 29 can vary the voltage. It does. Also, in the specification— Can I just ask, why are the batteries not part of these means? Perhaps they should be. Perhaps they should be. They provide the power. It's not variable power at that point. And I think the reasoning was, well, it does not variable power at that point. Creating variable power comes later. But, again, the specification and the invention, as the inventor presented it, as he created it, has BAT 1 and BAT 2, two batteries. So, at a minimum, there are two power sources that have to exist here. Maybe there could be a battery, and maybe one could be something that's the equivalent of a battery, like a direct line to an AC. But there have to be two power sources. And once there are two power sources, there has to be a power director, because you can't select between the— even by their lines, you can't select between the two power sources without a power director. So maybe they should be. We didn't—the parties didn't argue that, and perhaps they should be. But what we did agree to was the function, and the function is supplying the variable power. And they have said that the power director supplies variable power. So you can't change that now. You can't walk away from what the inventor said was the pattern, because if you do that, that's what changes the pattern. Now, if the court has any questions, I'd be happy to address them. Let me ask—I think I've addressed all the issues. Thank you, Mr. Hodge. Thank you very much, Your Honor. Mr. Harris? Thank you. Let me start briefly by addressing the logic control means issue. To uphold the district court's decision, this court has to equate generating with encoding and with modulating. What does the gray code encoder do? Very simple. Binary address generated by the address generator 21 are gray coded by an encoder 25 before being input into the SLU rate controller 17 and to the solid state memory 13. And then just to finish the description, what—describe technically what the SLU rate controller does to— The SLU rate controller— Encoding stuff coming out of the encoder. As described in this patent, the SLU rate controller modulates the rise and fall of the signal generated by the binary address generator. In other words, it softly drives is the phrase that's used in the patent. Rather than jumping up quickly, it slowly ramps up, but it's the same signal. The encoder— But it'll look different, of course, along the time axis. If you're familiar with smoothing, it's like smoothing. It gets it to the same place. It just takes it longer to get there. And it gets it to the same place going down. Again, though, it just takes it longer to get there. And that's a power conservation strategy. But it's the same signal. Similarly, encoding is simply— In the patent or otherwise that you would— Either in the context of this patent or more generally, that would be described as the same signal? Well, if you— Turn to the patent. The patent— It talks about the slew rates of all the digital inputs. I'm sorry, it's on column 3 on page A6. And line— It starts at line 39. Mm-hmm. The slew rates of all the digital inputs to the solid-state memory are minimized using slew rate controllers. Now, earlier they'd explained what a slew rate was, which is dv over dt. In other words, the change in voltage over the change in time is what's referred to as a slew rate. And then it says slew rate controllers may be input drivers designed to have prolonged rise times and fall times in comparison to conventional input drivers. So in other words, they simply just slow down the slew rate, the change in v over the change in t. And the way they do that isn't by changing v, the voltage. They do that by changing t and lengthening the amount of times over which that change in voltage occurs. Right, but I take it, and maybe I've misunderstood this, but I take it that the other side's point is that what leaves the address generator is a different signal from what leaves the encoder, which in turn is a different signal from what leaves the slew rate controller. And if you work backwards from the requirement that all this has to be about the signal provided to the DRAM, you need to include everything that gets you to the creation of that signal, which is the one coming out of the slew rate controller. And therefore, it seems their position is that those are actually different signals at those two arrows. Why is that wrong? Because what you're doing then is you're equating modification with generating. The signal is generated. The patent is clear. The patent says the binary address generator generates the signal. What then happens is that signal is modified through encoding. It's still the same signal. It has just been put into a different representation of ones and zeros in an effort to save power. Then that signal leaves the encoder and travels to the slew rate, where again it is modified simply to change the amount of time that the voltage rise and fall occurs over. Okay. Anything else, Mr. Harrison? No. I think that's going to do it. Okay. Thank you very much. Thank you. Thank you both, counsel. The cases are submitted. All rise. Leon McCoy is adjourned for today's debate.